**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**March 4, 2025**

**Christopher M. Wolpert**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

GLEN A. JACKSON,

    Defendant - Appellant.

No. 24-2042
(D.C. No. 1:22-CR-00890-JB-1)
(D. N.M.)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **BACHARACH**, **MURPHY**, and **EID**, Circuit Judges.
_____

**I. INTRODUCTION**

Glen Jackson appeals from an order of the district court denying his motion to

suppress (Dist. Ct. Dkt. No. 20) and supplemental motion to suppress (Dist. Ct. Dkt.

No. 38). This court exercises jurisdiction pursuant to 28 U.S.C. § 1291. The district

court did not err in (1) concluding law enforcement's interactions with Jackson

pre-arrest were a consensual non-seizure; (2) finding Jackson's "self-search" of his

luggage was consensual; (3) concluding law enforcement had probable cause to arrest

Jackson after the self-search of the luggage; (4) concluding law enforcement had

_____

[*] This order and judgment is not binding precedent, except under the doctrines
of law of the case, res judicata, and collateral estoppel. It may be cited, however, for
its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

probable cause to seize Jackson's luggage; and (5) finding the inventory search of Jackson's luggage was undertaken in good faith. Thus, the order of the district court denying Jackson's motions to suppress is **affirmed**.

## II. BACKGROUND

### A. Factual Background

Because Jackson appeals "from the denial of motions to suppress, we recite the facts in the light most favorable to the government and accept the district court's findings of fact unless they are clearly erroneous." *United States v. Briggs*, 720 F.3d 1281, 1283 (10th Cir. 2013).

Jarrell Perry is a Drug Enforcement Agency ("DEA") Special Agent. On April 29, 2022, Perry conducted an interdiction operation at the Greyhound bus station in Albuquerque, New Mexico. Perry wore plain clothes and concealed his firearm, badge, and handcuffs. DEA Task Force Officer Ray Zamarron accompanied Perry on the interdiction operation. Like Perry, Zamarron was wearing plain clothes and did not have a firearm, badge, or handcuffs visible. The officers boarded an eastbound Greyhound bus. Perry stood at the rear of the bus, waiting for passengers to board. Zamarron stood at the front, behind the driver's seat, not blocking the exit. There were fifteen to twenty people on the bus.

After questioning other passengers, Perry approached a passenger named Osorio,[1] showed him his badge, and asked him questions. When speaking to Osorio,

---

[1] Neither the district court order nor the record reflects Mr. Osorio's first name.

Perry stood to the rear of Osorio's seat, partially in the aisle. Perry told Osorio he was searching for "contraband." Perry did not tell Osorio he could refuse consent to have his belongings searched. Osorio did not consent to Perry searching his bags. When Perry asked Osorio to open his bag to show Perry its contents, Osorio did so. Inside Osorio's opened bag, Perry saw packaging and bundles. Seconds later, Perry arrested Osorio for possession with intent to distribute more than 500 grams of cocaine. Zamarron walked Osorio to the front of the bus.

Perry then approached Jackson, who was sitting across the aisle from where Osorio was sitting and saw Osorio's questioning and arrest. Displaying his DEA badge, Perry told Jackson: "I'm a police officer, and we check the bus here. I'm sure you saw me. May I speak to you for a moment?" Jackson responded, "yeah." While interacting with Jackson, Perry stood just behind Jackson's seat, in the aisle. Zamarron remained at the front of the bus, behind the driver's seat. Perry spoke to Jackson for roughly three-and-a-half minutes. Perry asked Jackson about his travel plans. Jackson told Perry he was traveling from Perris, California, to Oklahoma. Perry asked if he could see Jackson's bus ticket. Jackson showed a digital ticket, listing the name "Rashad Mitchell." Perry then asked Jackson for his identification card. Jackson handed Perry an identification card with a Georgia address, listing a June 2, 1979, date of birth, and the name Glen A. Jackson, Jr. Jackson confirmed that he was a Georgia resident. After reviewing Jackson's ID for "just a few seconds," Perry returned it to Jackson. In Perry's professional experience, it is common to see

individuals delivering illegal narcotics traveling to a destination that does not correspond to their home address.

There were two bags on the floor next to Jackson: a white Dolce & Gabbana shopping bag on top of a black duffle bag. Perry asked Jackson if Jackson was traveling with luggage. Jackson responded that he had luggage in the cargo hold. He also reached down to identify the white Dolce & Gabbana shopping bag as his own, but not the black duffle bag. Perry asked whether Jackson had any additional luggage in the bus cabin. Jackson responded in the negative. Perry asked Jackson if he would "voluntarily consent for a search of the bag you have with you for contraband." Jackson did not answer whether he would permit Perry to search his white Dolce & Gabbana bag. Nevertheless, Jackson showed Perry the contents of the white Dolce & Gabbana by opening the bag and moving his hands quickly around inside the bag. In Perry's experience as a DEA agent, it is common for passengers searching their own bags in his presence to move things around inside the bag in a quick and nervous manner if they have an item they do not want a DEA agent to see. When Jackson was moving his hands around the inside of the white Dolce & Gabbana bag, Perry did not tell him to go slower or show him particular items in the bag. After moving his hands around the inside of the Dolce & Gabbana bag, Jackson left the bag on the floor.

Perry again asked Jackson if he would permit Perry to search the white Dolce & Gabbana bag for contraband. Perry did not tell Jackson he could refuse consent to have his belongings searched. Nevertheless, Jackson denied having contraband and said: "I don't give consent to search my stuff." Perry responded by informing

Jackson it was his right to refuse the search. Perry asked Jackson if the black duffle bag under the white Dolce & Gabbana bag belonged to Jackson. Jackson responded in the affirmative. In Perry's professional experience, it is common for passengers who have illegal narcotics in a bag to attempt to distance themselves from that bag by not claiming it as their luggage. Perry asked Jackson to show him the contents of the black duffle bag. Jackson lifted his black duffle bag from the floor, arose from his seat, and placed the black duffle bag on the empty window seat next to him. While doing so, Jackson stood in front of the aisle seat, facing the window, in part blocking Perry's view. Perry stood just behind Jackson's seat, in the aisle, with one foot partially behind Jackson's seat and the other foot partially in the aisle. Jackson showed Perry the black duffle bag's contents by opening the bag and quickly moving the items inside the bag. Perry saw bulges and thin, clear plastic inside the clothing in Jackson's bag. Perry thought the plastic was vacuum-sealed or heat-sealed. In Perry's experience as a DEA agent, he observed heat-sealed or vacuum-sealed plastic during interdiction operations on hundreds of occasions and, every time, it contained illegal narcotics or proceeds from the sale of illegal narcotics. Perry thought there were bundles of plastic-wrapped narcotics inside the bulging clothing in the black duffle bag.

Perry arrested and handcuffed Jackson and told him he was under arrest "for the contents of your bag." During Perry's interactions with Jackson, Perry addressed Jackson as "sir." Perry consistently used the words "please" and "thank you." Before the arrest, Perry did not touch Jackson, display any weapons, or make any threats.

Before Perry arrested Jackson, Zamarron did not interact with Jackson or obstruct the aisle of the bus.

After Perry arrested Jackson, one of the officers removed from the bus the white Dolce & Gabbana bag, black duffle bag, and a blue rolling duffle bag Jackson stored in the cargo hold. At that time, DEA had in effect an "Inventory Search Policy." In his capacity as a special DEA agent, Perry conducts inventory searches of all items he takes into custody after an arrest, regardless of whether he believes the items contain narcotics. DEA agents, including Perry, searched all three of Jackson's bags in a processing room at the Albuquerque DEA office. At that time, the DEA did not have a search warrant. In the white Dolce & Gabbana shopping bag, the DEA found 1.10 gross kilograms of heroin in a clear plastic, heat-sealed bundle. In the black duffle bag, the DEA found 3.25 gross kilograms of marijuana in six clear plastic, heat-sealed bundles. Perry recorded the results of the inventory search, both contraband and non-contraband, in the appropriate DEA forms. The DEA initially sent the non-narcotic items found in Jackson's bags "to the ADO Non-Drug Evidence Custodian for storage and safekeeping." It ultimately returned the non-narcotic items found in Jackson's bags to Jackson's attorney.

**B. Procedural Background**

Jackson was indicted on a single count of possessing heroin with intent to distribute, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(A). In response to the indictment, Jackson filed a motion to suppress and a supplemental suppression motion. Jackson's suppression motions asserted that several aspects of his

interactions with Perry violated his Fourth Amendment rights. The district court denied Jackson's motions in a thorough 116-page order. In so doing, the district court made the following controlling factual findings and/or legal determinations: (1) Perry's interactions with Jackson were consensual; (2) Jackson's voluntary decision to show Perry the contents of his luggage was a consensual "self-search"; (3) Perry had probable cause to arrest Jackson, and to seize his luggage, after Jackson's self-search of the luggage; and (4) the inventory search of Jackson's luggage was properly undertaken in conformity with DEA policy and conducted in good faith. Jackson appeals.

## III. ANALYSIS

### A. Consensual Encounter

Jackson asserts the district court erred in concluding his interactions with Perry, up through and including the asserted self-search of his luggage, were consensual. *Cf. Florida v. Bostick*, 501 U.S. 429, 434 (1991) (holding that a consensual encounter is not a seizure within the meaning of the Fourth Amendment and, thus, need not be supported by reasonable suspicion of criminal activity). Instead, according to Jackson, he was subject to an illegal detention because a reasonable person in his position would not have understood he was free to decline any interaction with Perry. *Cf. United States v. Drayton*, 536 U.S. 194, 197 (2002) (holding that the "Fourth Amendment permits police officers to approach bus passengers at random to ask questions and to request their consent to searches, provided a reasonable person would understand that he or she is free to refuse").

7

"The unlawful detention inquiry is fact-intensive." *United States v. Guerrero*, 472 F.3d 784, 786 (10th Cir. 2007) (alteration and quotation omitted). This court reviews "the district court's fact findings for clear error." *Id.* "[T]he ultimate issue of whether a seizure occurred" is, however, a question of law this court reviews de novo. *Id.*

To help determine whether a police-citizen encounter is sufficiently coercive as to amount to a seizure, this court examines the following:

> (1) the location of the encounter, particularly whether it occurred in an open place within the view of people other than officers or a small, enclosed space without other members of the public nearby; (2) the number of officers involved; (3) whether an officer touched the defendant or physically restrained the defendant's movements; (4) the officer's attire; (5) whether the officer displayed or brandished a weapon; (6) whether the officer used aggressive language or tone of voice that indicated compliance with a request might be compelled; (7) whether and for how long the officer retained the defendant's personal effects, such as identification; and (8) whether the officer advised the defendant that he had the right to terminate the encounter.

*United States v. Tafuna*, 5 F.4th 1197, 1201 (10th Cir. 2021). Jackson bears the burden of demonstrating he was detained. *Id.* Consideration of the factors identified in *Tafuna* alongside the district court's factual findings, which Jackson does not contest on appeal, compels the conclusion a reasonable person in Jackson's position would have felt free to terminate the encounter with Perry.

Perry approached Jackson in the presence of fifteen-to-twenty bus passengers. *Id.* (first factor). Only Perry interacted with Jackson; Zamarron stood at the front of the bus leaving the exit clear. *Id.* (second factor). Perry did not touch or restrain Jackson and did not block his route to the aisle. *Id.* (third factor). Both Perry and

8

Zamarron were in plain clothes without visible firearms, badges, or handcuffs. *Id.* (fourth and fifth factors). Perry used polite language and a friendly tone when interacting with Jackson and did not make any threats. Indeed, Perry initiated the encounter by asking Jackson the following question: "May I speak with you for a moment?" *Id.* (sixth factor). Perry possessed Jackson's ID for a "few seconds" before returning it and never took possession of any of his other property before his arrest. *Id.* (seventh factor). Furthermore, Perry affirmed before Jackson's self-search of his black duffle bag that Jackson had a right to refuse a search of his bag. *See id.* (eighth factor). Thus, a consideration of the relevant factors demonstrates Perry's interactions with Jackson prior to Jackson's arrest bear the undeniable hallmarks of a consensual encounter.

That conclusion is confirmed by the Supreme Court's decision in *Drayton*, which held that circumstances materially indistinguishable from those present here did not amount to a seizure. 536 U.S. at 203-04. This court's precedents are in accord. *See, e.g.*, *United States v. Easley*, 911 F.3d 1074, 1079-80 (10th Cir. 2018); *United States v. Broomfield*, 201 F.3d 1270, 1275 (10th Cir. 2000); *United States v. Tapia*, 309 F.3d 1283, 1285-88 (10th Cir. 2002). Jackson does not meaningfully engage with any of this authority. Instead, he identifies four facts he contends demonstrate the encounter was sufficiently coercive to convey to a reasonable person he was not free to terminate the encounter: (1) Perry displayed his badge and told Jackson that he was a police officer; (2) Perry did not affirmatively advise Jackson he could end the encounter; (3) Jackson witnessed Osorio's arrest; and (4) the bus's

"quarters" were "cramped." As the United States notes, however, identical facts were present in *Drayton* and, importantly, the Court rejected the assertion they converted an otherwise consensual encounter into a seizure. *See Drayton*, 536 U.S. at 204 (holding that mere presence of badge, uniform, or holstered weapon is not a weighty consideration); *id.* at 202-03 (rejecting rule requiring officers to advise passengers of their right not to cooperate before an encounter can be consensual); *id.* at 206 ("The arrest of one person does not mean that everyone around him has been seized by police."); *id.* at 201-02 (explaining that the confinement of a bus rider's movements is "the natural result of choosing to take the bus" and "says nothing about whether the police conduct is coercive"). The district court did not err in concluding that the encounter between Jackson and Perry was consensual at all points prior to Jackson's arrest.

## B. Luggage Search

Jackson asserts the district court erred in concluding that the "self-search" of his luggage was consensual. "Voluntary consent is a longstanding exception" to the Fourth Amendment's warrant requirement. *United States v. Guillen*, 995 F.3d 1095, 1103 (10th Cir. 2021). "The exception applies when the government proves (1) the officers received either express or implied consent and (2) that consent was freely and voluntarily given." *Id.* The district court concluded the government met its

burden as to both requirements.[2] Each determination entails a finding-of-fact this court reviews for clear error. *Id.*

The district court did not clearly err in finding Jackson consented to self-searches of his luggage. When Perry asked Jackson if he would voluntarily consent to a search of the white Dolce & Gabbana bag, Jackson did not respond. Nevertheless, Jackson showed Perry the contents of that bag by opening it and moving his hands quickly around inside the bag. When Jackson was moving his hands around the inside of the Dolce & Gabbana bag, Perry did not tell him to go slower or direct him to display items in the bag. Perry again asked Jackson if he would permit Perry to search the Dolce & Gabbana bag for contraband. Jackson specifically refused consent, stating "I don't give consent to search my stuff." Perry responded by informing Jackson it was his right to refuse the search. Perry then asked Jackson to show him the contents of the black duffle bag. Jackson lifted that bag from the floor, arose from his seat, and placed it on the empty window seat next to him. Jackson showed Perry the black duffle bag's contents by opening the bag and quickly moving the items inside the bag. Consent may be granted "through gestures or other indications of acquiescence." *Guerrero*, 472 F.3d at 789. The district court did not clearly err in finding the conduct described above amounted to express or implied

---

[2] Alternatively, the district court concluded Jackson's self-search of his luggage did not amount to a search at all and, therefore, did not implicate the Fourth Amendment. Because this court concludes, as set out below, that the district court did not clearly err in concluding Jackson's self-search of his luggage was consensual, it is unnecessary to address the more difficult question of whether the conduct at issue here amounted to a Fourth Amendment search.

consent. *See Guillen*, 995 F.3d at 1103; *see also United States v. Patten*, 183 F.3d 1190, 1194-95 (10th Cir. 1999) (holding that a defendant communicated consent when he opened his suitcase in response to an officer's request to be allowed to search).

Nor did the district court clearly err in determining Jackson's consent was freely and voluntarily given. As the Supreme Court noted in *Drayton*, when "the question of voluntariness pervades both the search and seizure inquiries, the respective analyses turn on very similar facts." 536 U.S. at 206; *see also United States v. Jones*, 701 F.3d 1300, 1318 (10th Cir. 2012) (setting out voluntariness-of-consent-to-search factors very similar to the factors this court used in *Tafuna* to determine whether a police-citizen encounter was consensual). Thus, for those reasons set out above in concluding Jackson's interactions with Perry during the search of the luggage was a consensual encounter, the district court did not clearly err in finding Jackson consented to the self-searches of his luggage. That is, Perry did not touch Jackson, display his weapon, or make any threats. He used a friendly tone and was the only officer to interact with Jackson. And, importantly, when Jackson declined Perry's request to allow Perry to search the Dolce & Gabbana bag, Perry responded by telling Jackson that it was his right to refuse to consent.

## C. Probable Cause to Arrest Jackson and Seize His Luggage

Jackson argues his arrest, along with the corresponding seizure of his luggage, was improper. He contends it was not a "foregone conclusion" he was engaged in criminal activity or that his luggage contained contraband. Jackson's arguments,

however, are based on inapposite case law. In support of his proposed "foregone-conclusion" standard, Jackson cites to this court's decisions in *United States v. Johnson*, 43 F.4th 1100, 1112 (10th Cir. 2022), and *United States v. Corral*, 970 F.2d 719, 725 (10th Cir. 1992). These cases, however, deal with warrantless searches in general and the plain-view exception to the warrant requirement in particular. *Johnson*, 43 F.4th at 1110-13; *Corral*, 970 F.2d at 723-26.[3] Instead, the appropriate question is the one asked by the district court: was there probable cause to believe Jackson was committing a crime and probable cause to believe evidence of that crime or contraband was in Jackson's luggage. *See Hinkle v. Beckham Cnty. Bd. of Cnty. Comm'rs*, 962 F.3d 1204, 1220 (10th Cir. 2020) ("A warrantless arrest is permissible when an officer has probable cause to believe that a person committed a crime." (quotation and alteration omitted)); *Johnson*, 43 F.4th at 1110 (holding seizure of an object is appropriate if there exists "probable cause to believe it [is] contraband or evidence of a crime"). Probable cause "requires only a probability or substantial

---

[3] To be clear, *Corral* involved both a plain-view seizure and a plain-view search. *Corral* explained, however, that the standards applicable were not coterminous. *Compare* 970 F.2d at 724 (holding that a plain-view seizure is proper when there exists a "practical, nontechnical probability that incriminating evidence is involved" (quotation omitted)), *with id.* at 725 ("In cases involving closed containers, . . . the plain view doctrine may support the warrantless *seizure* of a container believed to contain contraband but any subsequent *search* of the concealed contents of the container must be accompanied by a warrant or justified by one of the exceptions to the warrant requirement."), *and id.* ("However, where the contents of a seized container are a foregone conclusion, this prohibition against warrantless searches of containers under the plain view doctrine does not apply."). Thus, Jackson is simply wrong to argue that either his arrest or the seizure of his luggage was only appropriate if it was a foregone conclusion there were drugs in his luggage.

chance of criminal activity, not an actual showing of such activity." *Illinois v. Gates*, 462 U.S. 213, 243 n.13 (1983). It "is not a high bar," but instead requires "only the kind of fair probability on which reasonable and prudent people, not legal technicians, act." *Kaley v. United States*, 571 U.S. 320, 338 (2014) (quotations and alterations omitted). This court examines "the events leading up to the arrest, and then decide[s] whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to probable cause." *Hinkle*, 962 F.3d at 1220 (quotation omitted). The ultimate question of whether probable cause existed is one of law this court reviews de novo. *United States v. Valenzuela*, 365 F.3d 892, 896 (10th Cir. 2004).

The district court correctly concluded Perry had probable cause to arrest Jackson. During the consensual encounter, Perry learned Jackson was traveling under an assumed name and "to and from places where he did not live." *See United States v. Gordon*, 173 F.3d 761, 767 (10th Cir. 1999) (noting how the defendant was travelling on a train under an assumed name contributed to existence of probable cause). Jackson failed to disclose the black duffle bag belonged to him when Perry first approached him. *See Johnson*, 43 F.4th at 1108 (concluding a similar lie about non-ownership of luggage contributed to existence of probable cause). Jackson furtively positioned himself in front of Perry while conducting the self-search of the black duffle bag and was "evasive and harried" while revealing the bags' contents. *See id.* 1108 (holding that "furtive efforts . . . can factor into the probable cause analysis" (quotation omitted)). Perry could see bulges and heat-sealed plastic inside

Jackson's duffle bag. Nevertheless, Jackson falsely denied that there was anything other than clothes in his duffle bag. *See id.* (holding that presence of items indicative of drug trafficking in luggage supports probable cause); *United States v. Moore*, 22 F.3d 241, 244 n.4 (10th Cir. 1994) (holding that "lying to an officer is *not* consistent with innocent travel"). Perry testified that each of these factors were indicative of narcotics trafficking based on his experience. In particular, he testified he (1) had encountered individuals concealing narcotics inside clothing anywhere from 50 to 100 times and the bulges he saw were consistent with concealed narcotics; (2) in his twenty-three years as a DEA agent he saw the same vacuum sealed plastic "hundreds of times" and all those previous occasions it contained either illegal narcotics or proceeds from illegal narcotics; and (3) he never saw similar vacuum sealed plastic that did not contain illegal narcotics or proceeds therefrom. The district court properly relied on Perry's "experience in deciding whether probable cause exists." *Ornelas v. United States*, 517 U.S. 690, 700 (1996). Because the facts available to Perry at the time of Jackson's arrest allowed a reasonable police officer to conclude there was a substantial chance Jackson was engaged in criminal activity, the district court did not err in concluding Jackson's arrest was supported by probable cause. *See Hinkle*, 962 F.3d at 1220.

Perry likewise had probable cause to seize Jackson's luggage. Under the plain view doctrine, an officer may seize evidence without a warrant if "(1) the officer was lawfully in a position from which the object seized was in plain view, (2) the object's incriminating character was immediately apparent (i.e., there was probable cause to

15

believe it was contraband or evidence of a crime), and (3) the officer had a lawful right of access to the object." *United States v. Angelos*, 433 F.3d 738, 747 (10th Cir. 2006); *see also supra* note 3. All three requirements are satisfied here. Perry was lawfully able to view inside Jackson's duffle bag because Jackson voluntarily opened it. The incriminating character of the plastic-wrapped bundles was immediately apparent to an experienced officer like Perry. That is, the same facts that support Perry's probable cause to arrest Jackson also gave him probable cause to believe the luggage contained contraband or evidence of criminal activity. *Johnson*, 43 F.4th at 1110-11 (so concluding). Finally, Perry was lawfully on the bus. Accordingly, the district court correctly concluded Perry's seizure of Jackson's bags was lawful.

**D. Inventory Search of Luggage**

Jackson contends the district court erred in concluding Perry's post-arrest inventory search of Jackson's luggage was valid. "Inventory searches are . . . a well-defined exception to the warrant requirement." *Colorado v. Bertine*, 479 U.S. 367, 371 (1987). Such a search is valid "only if conducted according to standardized procedures." *United States v. Haro-Salcedo*, 107 F.3d 769, 772 (10th Cir. 1997). "An inventory search must not be a ruse for a general rummaging in order to discover incriminating evidence, but rather an administrative procedure designed to produce an inventory." *Id.* at 772-73. On appeal, Jackson raises a narrow challenge to the inventory search: it was conducted in bad faith for purely investigatory purposes. "Whether an administrative search is a pretext for a criminal investigation is a factual question," subject to review only for clear error. *United States v. Johnson*, 994 F.2d

16

740, 742-43 (10th Cir. 1993); *see also United States v. Nielsen*, 74 F.4th 572, 576 (8th Cir. 2023) ("We . . . review the district court's findings of fact regarding the circumstances of an inventory search for clear error, including the question of pretext.").

The district court found no evidence of pretext on the part of Perry. That finding is fully supported by the record. As the district court noted, Perry testified he conducts inventory searches of all items he takes into custody after an arrest regardless of whether he expects them to contain narcotics. Furthermore, the district court's findings detail at length the various DEA forms Perry filled out in conducting the search in accordance with DEA's standardized practice in conducting inventory searches. Perry testified at the hearing on Jackson's suppression motions and the district court obviously found him credible. Indeed, this court cannot find in the record any evidence calling into question the district court's finding that Perry undertook the inventory search in good faith. That being the case, Jackson's challenge to the inventory search necessarily fails.

## IV. CONCLUSION

For those reasons set out above, the order of the United States District Court for the District of New Mexico denying Jackson's motion and supplemental motion to suppress is hereby **AFFIRMED**.

Entered for the Court


Michael R. Murphy
Circuit Judge